UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
1:26-CV-928

JANE DOE,

Plaintiff,

vs.

FPG LABS LLC D/B/A OVATION FERTILITY, WAKE FOREST UNIVERSITY BAPTIST MEDICAL CENTER, WAKE FOREST UNIVERSITY HEALTH SCIENCES, WAKE FOREST HEALTH NETWORK, LLC, ATRIUM HEALTH, INC., THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY D/B/A ATRIUM HEALTH, AND ADVOCATE HEALTH, INC. D/B/A ATRIUM HEALTH,

Defendants.
_______________________________________/

# COMPLAINT

Plaintiff, JANE DOE (hereinafter referred to as the "Plaintiff") brings this Complaint against Defendants FPG LABS LLC D/B/A OVATION FERTILITY, WAKE FOREST UNIVERSITY BAPTIST MEDICAL CENTER, WAKE FOREST UNIVERSITY HEALTH SCIENCES, WAKE FOREST HEALTH NETWORK, LLC, ATRIUM HEALTH, INC., THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY D/B/A ATRIUM HEALTH, AND

ADVOCATE HEALTH, INC. D/B/A ATRIUM HEALTH, (hereinafter collectively referred to as "Defendants") and allege as follows:

## PARTIES

1. Plaintiff, Jane Doe, is a citizen of Virginia and had fertility treatments in Winston-Salem, North Carolina. Given the sensitive nature of her claim, Plaintiff Doe is using a pseudonym to protect her privacy. Plaintiff Doe is moving simultaneously for permission to proceed under a pseudonym.

2. Defendant FPG Labs LLC d/b/a Ovation Fertility ("Ovation") is headquartered at 105 West Park Drive, Suite 370, Brentwood, Tennessee 37027.

3. Ovation promotes itself as a leading national network of fertility laboratories providing leading-edge treatment through the hands and minds of the world's foremost reproductive experts.

4. During the relevant time period, Ovation performed pre-implantation genetic testing for aneuploidy ("PGT-A") through its network of laboratories called Ovation Genetics.

5. Ovation Genetics is located at 125 Cool Springs Boulevard, Franklin, Tennessee 37067.

6. Defendant Wake Forest University Baptist Medical Center is a non-profit corporation, organized and existing by virtue of the laws of the State of North Carolina, with its principal place of business located in Winston-

Salem, Forsyth County, North Carolina.

7. Defendant Wake Forest University Health Sciences is a non-profit corporation, organized and existing by virtue of the laws of the State of North Carolina with its principal place of business in Winston-Salem, Forsyth County, North Carolina.

8. Defendant Wake Forest Health Network, LLC is a limited liability company organized and existing by virtue of the laws of the State of North Carolina with its principal place of business in Winston-Salem, Forsyth County, North Carolina.

9. Defendant Advocate Health, Inc. is a Delaware corporation with its principal North Carolina address in Charlotte, Mecklenburg, North Carolina.

10. Defendant Atrium Health, Inc. is a North Carolina corporation organized and existing by virtue of the laws of the State of North Carolina with its principal office located in Charlotte, Mecklenburg County, North Carolina.

11. Defendant the Charlotte-Mecklenburg Hospital Authority is a North Carolina Hospital Authority with its principal office located in Charlotte, Mecklenburg County, North Carolina.

12. Defendants Advocate Health, Atrium Health, the Charlotte Mecklenburg Hospital Authority, Wake Forest University Medical Center, Wake Forest University Health Sciences, and Wake Forest Health Network,

together owned and operated the Atrium Health Wake Forest Baptist Center for Fertility and Reproductive Surgery located at 111 Hanestown Court in Winston-Salem, Forsyth County, North Carolina. These entities are collectively herein referred to as “the IVF Clinic”.

## BACKGROUND

13. Plaintiff knew she wanted to have a family.

14. Due to diminished ovarian reserve and concerns about infertility, in 2017, Plaintiff went to the IVF Clinic for oocyte cryopreservation.

15. With the assistance of the IVF clinic, Plaintiff took medication to stimulate the follicles to create several mature eggs for collection.

16. In or around October 2017, the IVF clinic collected 15 eggs from Plaintiff and noted that 11 of the eggs were mature.

17. The IVF clinic, thereafter, froze 14 eggs for future use and Plaintiff paid to keep those eggs frozen.

18. In June 2023, the Plaintiff returned to the IVF clinic to begin undergoing fertility treatments and attempting to have a baby through in vitro fertilization (“IVF”).

19. The Plaintiff’s IVF treatment started with fertilizing her previously frozen eggs with sperm to create embryos.

20. If the embryos reached the blastocyst stage, they were then ready for transfer to see if they result in a pregnancy.

21. In an effort to increase the success of this process, PGT-A was created as an add-on to the process to screen the embryos and determine which are best suited for transfer.

22. PGT-A testing is sold by Ovation.

23. Ovation represented that it was a "state-of-the-art genetics laboratory" and that it represents the "best available genetic tests to support selection of embryos with the best chance of creating a healthy pregnancy." [1]

24. Ovation further represented that it uses the "most advanced technology available" and has "the most advanced PGT options available".[2]

25. If the PGT-A testing product is purchased from Ovation, a biopsy is taken by the IVF clinic from the trophectoderm component of the embryo (meaning the outer layer of the blastocyst) after the embryo reaches the blastocyst stage of development.

26. During the biopsy, the embryologist creates a hole in the embryo's zona pellucida which allows for the removal of five to ten cells from the trophectoderm component of the embryo.

27. The biopsy is sent to Ovation for PGT-A testing to be performed.

28. Meanwhile, the embryos are frozen and stored with the IVF Clinic while PGT-A testing is performed by Ovation.

---

[1] www.Ovationfertility.com/genetic-testing-options-for-patients/comprehensive-pgt/ (last visited March 7, 2024).

[2] http://www.Ovationfertility.com/genetic-testing/ (last visited June 27, 2024).

29. Test results are then provided by Ovation to the IVF Clinic and to the patient.

30. Based on those results, it is determined which embryos are "euploid" or best suited for implantation and which embryos are "aneuploid" or abnormal and not suited for implantation.

31. Biopsies were taken by the IVF clinic from Plaintiff's three embryos for PGT-A testing on August 10, 2023.

32. The biopsies were received by Ovation on August 15, 2023.

33. On the same day that the biopsies were received by Ovation, Plaintiff signed an Informed Consent with Ovation on August 15, 2023, which stated that a) the chance of a miscarriage or conceiving a baby with a chromosomal aneuploidy is reduced with PGT-A, b) PGT-A improves the chance for pregnancy and live birth; c) successful live births have proven to be more efficiently achieved, and d) misdiagnosis is less than 2%.

34. The analysis of the Plaintiff's embryo biopsies occurred on Ovation's LifeView platform on September 18, 2023 and the results indicated that all three embryos had no result due to no amplification.

35. John David Wininger of the IVF Clinic informed the Plaintiff of an error with her PGT-A testing on September 18, 2023.

36. September 18, 2023 was the first time Plaintiff learned that an error had occurred during Ovation's PGT-A testing of her embryo biopsy

samples and that the testing had failed to perform as represented to her. Prior to September 18, 2023, Plaintiff had no knowledge of any error with Ovation's testing or any reason to question the accuracy, reliability, or representations made by Ovation concerning its PGT-A testing. Plaintiff did not know at that time the nature or extent of Ovation's alleged misrepresentations and omissions concerning the accuracy, reliability, validation, and clinical benefits of its PGT-A testing.

37. Plaintiff contacted John David Wininger later that day for additional information on the testing error, why the biopsy samples were unusable and why her embryos would have to be rebiopsied.

38. On September 19, 2023, John David Wininger advised the Plaintiff that there was an error with the amplification of the biopsied cells and thus, the PGT-A testing could not get a reading as to whether the biopsied cells were chromosomally normal or chromosomally abnormal.

39. Plaintiff was referred to Amy Jones of Ovation for more information on the testing error.

40. Ms. Jones indicated an issue had occurred with amplification and the biopsy samples could not be retested.

41. Plaintiff also spoke with Cassie Miller of Ovation who stated that there was a human error during processing of the embryo biopsies.

42. Ms. Jones provided Plaintiff with advice and recommendations

concerning how Plaintiff should proceed with her embryos, including thawing the embryos for rebiopsy and testing on a different Ovation PGT-A platform. Ms. Jones further advised Plaintiff that the additional rebiopsy would not cause harm to Plaintiff's embryos.

43. Although Ms. Jones was communicating with Plaintiff on behalf of Ovation concerning the failed PGT-A testing, Ms. Jones was not qualified to provide medical advice concerning Plaintiff's fertility treatment or the medical risks and benefits associated with subjecting Plaintiff's embryos to additional thawing and rebiopsy.

44. Nevertheless, Plaintiff relied upon the information, advice, and recommendations provided by Ovation and Ms. Jones in determining how to proceed following the failed PGT-A testing.

45. Ovation and the IVF Clinic recommended to the Plaintiff that her three embryos be rebiopsied for testing.

46. Plaintiff's embryos would not have required thawing and rebiopsy for repeat PGT-A testing but for the error that occurred during Ovation's processing and amplification of Plaintiff's original embryo biopsy samples.

47. Embryos are fragile and vulnerable to damage from biopsy and the process necessary for PGT-A testing to be performed.[3]

---

[3] Aluko, A., et al., *Multiple cryopreservation – warming cycles, coupled with blastocyst biopsy, negatively affect IVF outcomes.* Reproductive Biomedicine Online. Vol. 42, Issue 3. March 2021.

48. Multiple cryopreservation and warming cycles, particularly when coupled with embryo biopsy, can negatively affect embryos and IVF outcomes.[4]

49. Both Ovation and the IVF Clinic recommended that Plaintiff proceed with additional thawing and rebiopsy of her embryos.

50. Neither Ovation nor the IVF Clinic adequately informed Plaintiff that subjecting her previously biopsied and cryopreserved embryos to an additional warming and biopsy cycle carried incremental risks, including the risk of damage to or loss of an embryo and potential adverse effects on IVF outcomes.

51. The IVF Clinic was responsible for performing the additional warming and rebiopsy and, consistent with the applicable standard of care, was responsible for adequately counseling Plaintiff and obtaining informed consent concerning the material risks, benefits, and reasonable alternatives associated with the additional procedure.

52. Plaintiff relied upon the recommendations of Ovation and the IVF Clinic and proceeded with the additional warming and rebiopsy without having been adequately informed of those material risks and without having provided informed consent with knowledge of those risks.

53. The additional thawing and rebiopsy subjected Plaintiff's embryos

[4] *Id.*

to risks they would not otherwise have encountered, and one of Plaintiff's three embryos did not survive the thaw necessary to perform the recommended rebiopsy.

54. Amy Jones of Ovation recommended that the Plaintiff have the rebiopsied samples tested on a different platform through Ovation, which had a lower risk of having the same error that occurred on the first round of testing on the LifeView platform.

55. Prior to Plaintiff's original PGT-A testing, Ovation did not disclose to Plaintiff that the PGT-A platforms it made available differed with respect to the risk of the type of amplification failure that subsequently occurred, despite later advising Plaintiff that another Ovation platform carried a lower risk of the same error.

56. Had Plaintiff been informed before purchasing and undergoing PGT-A testing that the LifeView platform presented a greater risk of the type of amplification failure that occurred than another PGT-A platform available through Ovation, Plaintiff would not have agreed to have her embryo biopsy samples tested using the LifeView platform without disclosure of and an opportunity to consider the available alternative.

57. Additional biopsies were taken from the remaining two embryos on October 11, 2023.

58. John David Wininger of the IVF Clinic was only able to rebiopsy

two of the embryos as the third did not make it through the thaw for the rebiopsy to occur.

59. Ovation received the rebiopsy samples on October 12, 2023 and the analysis of those embryos was conducted on Ovation's NextGen platform on October 25, 2023.

60. The results issued by Ovation, more than 2 months after the original biopsy of the Plaintiff's embryos, indicated that one embryo had a low mosaic result and one embryo had an abnormal result.

61. On October 26, 2023, Plaintiff spoke with Ovation's genetic counselor Katie Carlotti.

62. According to Ovation's genetic counselor, the low-level mosaic embryo had a 31 to 50 percent chance of having the abnormality which would lead to a high risk of miscarriage, stillbirth and birth defects.

63. Ovation's genetic counselor also noted that the abnormal embryo should not be transferred.

64. Based upon the recommendations of Ovation and the IVF Clinic, Plaintiff did not proceed with transfer of the embryos.

65. Then in January 2024, Plaintiff contacted the IVF Clinic regarding transfer of the embryo deemed "abnormal" by Ovation's PGT-A testing.

66. Initially, the IVF Clinic advised that they would be willing to consider transfer of the embryo due to errors with Ovation's testing.

67. However, the IVF Clinic later advised they would not feel comfortable transferring the "abnormal" embryo.

68. Ovation markets and sells PGT-A testing to individuals undergoing IVF to build their family. Specifically, PGT-A tests are marketed by Ovation as benefiting everyone pursuing IVF, being greater than 98% accurate, increasing the chance of pregnancy, leading to a higher chance of a healthy pregnancy, reducing the risk of miscarriage, reducing the time to pregnancy, increasing the chance of IVF success, and leading to no more mosaic embryos.

69. For each round of PGT-A testing, Plaintiff paid Ovation for the testing and the IVF clinic for costs associated with testing, including a biopsy fee.

70. Based upon Ovation's representations, Plaintiff trusted Ovation when she purchased PGT-A testing to be performed on her embryos.

71. Upon information and belief, Ovation lacked adequate platform-specific analytical and clinical validation sufficient to substantiate the accuracy, reliability, and clinical-benefit representations it made concerning the PGT-A testing sold to Plaintiff.

72. Studies have found that when looking at clinic pregnancy, miscarriage, or live-birth rates, there is no difference between cycles utilizing PGT-A and cycles not utilizing PGT-A. Further, research has shown that the

accuracy rating for PGT-A is significantly lower than 98%.[5]

73. Ovations' false statements have severe consequences on the Plaintiff who decided to proceed with PGT-A based upon Defendants' statements.

74. Plaintiff also purchased PGT-A because of the IVF Clinic's policy that the IVF Clinic will not create new embryos with genetically normal embryos in storage and the IVF Clinic's assurances that it was "home to state-of-the-art embryology and andrology laboratories" and that the IVF Clinic's state-of-the-art laboratory was "one of the few in the region capable of performing preimplantation genetic testing - a procedure that screens embryos for genetic diseases before it's placed for an IVF cycle."[6]

75. In this regard, Plaintiff reasonably relied upon the IVF Clinic website which provided the following information regarding PGT-A:

[5] Marin, D., et.al. *Preimplantation genetic testing for aneuploidy: A review of published blastocyst reanalysis concordance data*. Prenatal Diagnosis. Vol. 4, Issue 5. Pp. 545-553. April 2021.

[6] https://www.wakehealth.edu/specialty/r/reproductive-medicine (last visited September 16, 2024).

In partnership with genetic testing laboratories, we have expanded our in vitro fertilization program to include preimplantation genetic screening (PGS) – a promising approach to screen all 24 chromosomes to minimize the risk of transferring embryos with chromosomal abnormalities. Currently next-generation sequencing-based technology has been applied in clinical preimplantation genetic screening cycles for the selection of embryos with the correct number of chromosomes.

Embryos with chromosome abnormalities either do not implant or miscarry. PGS improves ongoing pregnancy rates and decreases miscarriage rates by selecting both morphologically and chromosomally normal embryos.

To increase the chances of having a chromosomally normal embryo for transfer, we also offer embryo batching to help build families for patients experiencing unexplained recurrent pregnancy loss, low responders, or who are of advanced reproductive age.

Only embryos free of chromosomal abnormalities or specific genetic disorders are transferred to the uterus, PGD and PGS therefore provides couples at risk the opportunity to know that any pregnancy they achieve should be unaffected.

PGD and PGS obviate the need of traditional prenatal diagnosis during a pregnancy and hence prevents the physical and psychological trauma, and ethical-moral problems associated with possible pregnancy termination.

[7]

76. Ensuring adequate quality control for any PGT-A testing is of critical importance given the enormous value of human embryos to their families.

77. Defendants are aware of the lengths to which IVF patients go to create embryos, their emotional and financial investment in assuring the viability of their embryos, and their expectations that the testing of said viability is accurate.

78. Inaccurate testing can result in the unnecessary harm and destruction of embryos.

[7] https://www.wakehealth.edu/treatment/p/preimplantation-genetic-diagnosis (last visited September 16, 2024).

79. Inaccurate testing can result in embryos being unable to be transferred.

80. Embryos are precious and irreplaceable. Human eggs, also known as oocytes, are a limited resource. A woman has about one million eggs at birth and this supply diminishes at a rate of about 1,000 eggs per month. This decline is part of the natural aging process and is commonly referred to as a woman's biological clock.

81. The loss of oocytes from the ovaries continues in the absence of menstrual cycles, and even when women are pregnant, nursing, or taking oral contraceptive.

82. Egg quality too diminishes with time, with miscarriages and chromosomal abnormalities occurring more frequently for older women.

83. The results of PGT-A testing have substantial ramifications for those seeking to become parents, both physically and mentally.

84. The IVF Clinic was responsible for performing the embryo biopsy needed for PGT-A testing while Ovation was responsible for performing the PGT-A testing, including amplification of the embryo biopsy.

85. The IVF Clinic was responsible for performing the embryology services within its control, including the biopsy, cryopreservation, warming, and handling of Plaintiff's embryos, while Ovation was responsible for performing the PGT-A testing on the biopsy samples submitted to it.

86. Upon information and belief, Ovation did not properly train and supervise their employees, agents and persons on how to operate and conduct PGT-A testing.

87. Ovation warranted that their policies and procedures for PGT-A testing were sufficient, “advanced”, and “state-of-the-art” despite knowing this was not true.

88. Plaintiff has suffered irreparable harm due to the actions of the Defendants.

89. Defendants’ actions as well as Ovation’s false and misleading statements had severe consequences, including the expenditure of thousands of dollars by Plaintiff, the loss of an embryo, and emotional damages.

90. Significant, important decisions about family building and how to proceed with transfers and retrievals were made by the Plaintiff based upon the results of PGT-A testing.

91. When the testing results are inaccurate or an error occurs and the testing does not perform as sold, those results have a detrimental effect.

92. Further, embryos that are assigned an “abnormal” or “aneuploid” testing result by Ovation cannot be transferred by the IVF Clinic.

93. Plaintiff purchased PGT-A testing due to her reliance upon Defendants’ ability to accurately perform the test and Ovation’s false and deceptive statements in selling the testing and their material omissions of the

truth about PGT-A testing.

94. As a result, Plaintiff has suffered economic and emotional loss.

95. Further, due to the IVF Clinic's refusal to allow the Plaintiff to transfer embryos that were assigned an "abnormal" or "aneuploid" testing result by Ovation and its policy that the IVF Clinic will not create new embryos with genetically normal embryos in storage, despite knowing the inaccuracy and errors with PGT-A testing, Plaintiff suffered additional economic and emotional loss.

96. Plaintiff purchased PGT-A testing based on false and deceptive statements that PGT-A testing was greater than 98% accurate, increased the rate of pregnancy and decreased the chance of miscarriage.

97. Plaintiff would not have purchased PGT-A testing and would not have been damaged had she known the truth as further detailed below.

98. Plaintiff would not have purchased or agreed to the PGT-A testing on the terms presented had she been adequately informed of the material limitations and risks alleged herein, including the risk of the type of amplification failure that occurred and the differences between the testing platforms available through Ovation.

99. When undergoing fertility treatments, every day, week and month is important so time lost due to errors, and errors that were not timely communicated, caused Plaintiff emotional and economic damage.

## JURISDICTION AND VENUE

100. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

101. Jane Doe is a citizen of Virginia and upon information and belief, none of Ovation's members are citizens of Virginia.

102. Plaintiff is a citizen of Virginia. Upon information and belief, none of the Defendants is a citizen of Virginia, and complete diversity therefore exists between Plaintiff and all Defendants. Plaintiff will amend her jurisdictional allegations, if necessary, upon disclosure of the membership and citizenship of the limited liability company Defendants.

103. Venue is proper in the United States District Court for the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Defendants conduct business in this District.

## CAUSES OF ACTION

### COUNT I
**Negligent Misrepresentation**
**(Ovation)**

107. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other paragraphs in this Complaint as though

fully set forth in this cause of action.

108. Ovation, in the course of its business and in connection with the sale and provision of PGT-A testing to Plaintiff, supplied false and misleading information concerning its PGT-A testing, including but not limited to the following:

a. Ovation represented that it was a "state-of-the-art genetics laboratory"

b. Ovation represented that it used the "best available genetic tests to support selection of embryos with the best chance of creating a healthy pregnancy."

c. Ovation represented that it uses the "most advanced technology available".

d. Ovation represented that it has "the most advanced PGT options available".

e. Ovation represented that its PGT-A testing benefits everyone pursuing IVF.

f. Ovation represented that its PGT-A testing is greater than 98% accurate.

g. Ovation represented that its PGT-A testing increases the chance of pregnancy.

h. Ovation represented that its PGT-A testing leads to a higher

chance of a healthy pregnancy.

i. Ovation represented that its PGT-A testing reduces the risk of miscarriage.

j. Ovation represented that its PGT-A testing reduces the time to pregnancy.

k. Ovation represented that its PGT-A testing increases the chance of IVF success.

l. Ovation represented that its PGT-A testing leads to no more mosaic embryos

109. Ovation had superior knowledge on PGT-A testing and had a duty to ensure the information was correct.

110. Ovation was in the business of providing and selling PGT-A testing and had a pecuniary interest in Plaintiff's purchase and use of its testing.

111. Ovation supplied information concerning the accuracy, reliability, efficacy, and benefits of its PGT-A testing for the Plaintiff to decide whether to purchase and use the testing.

112. Ovation supplied the foregoing information for the guidance of Plaintiff in deciding whether to purchase and use Ovation's PGT-A testing, and intended that Plaintiff rely upon that information.

113. Plaintiff reasonably relied on Ovation's representations.

114. Ovation made false representations, concealments, and non-

disclosures to Plaintiff about PGT-A testing services and its impact on embryos.

115. Ovation failed to exercise reasonable care or competence in obtaining and communicating the foregoing information to Plaintiff, and Plaintiff justifiably relied upon Ovation's representations and omissions in deciding to purchase and use Ovation's PGT-A testing.

116. As a direct and proximate result of the negligent misrepresentations concerning the reliability and accuracy of PGT-A, Plaintiff was harmed, and Ovation's misrepresentations were a substantial factor in causing harm.

**COUNT II**
**Negligence**
**(Ovation)**

117. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

118. At all times relevant hereto, Ovation and their agents and/or employees undertook to receive, process, amplify, test, safeguard, and report results from Plaintiff's irreplaceable embryo biopsy samples and owed Plaintiff a duty to exercise reasonable care in performing those services.

119. Ovation breached their professional duty to exercise reasonable care in all of the following respects:

a. Failing to have in place and/or compel compliance with protocols and procedures to ensure that PGT-A testing was properly performed.

b. Failing to properly or adequately hire, train, and/or supervise their employees and/or agents to ensure that said agents and/or employees were adequately performing PGT-A testing that would not pose harm to Plaintiff's embryos;

120. As a direct and proximate result of Ovation's misconduct, Plaintiff has suffered and will suffer substantial damages.

## COUNT III
## **Professional Negligence**
## **(Ovation)**

121. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

122. To the extent Ovation's conduct constitutes the furnishing or failure to furnish professional health-care services within N.C.G.S. § 90-21.11, Plaintiff pleads this claim in the alternative. Plaintiff does not concede that this action constitutes a "medical malpractice action" within the meaning of N.C.G.S. § 90-21.11(2).

123. At all relevant times, Ovation was engaged in the business of providing genetic laboratory testing services, including PGT-A, and undertook

to perform PGT-A testing on embryo biopsy samples submitted by Plaintiff.

124. In performing PGT-A testing, Ovation and its employees, agents, and laboratory personnel provided professional laboratory testing requiring specialized knowledge, training, skill, and judgment in genetics, and/or the performance, analysis, interpretation, quality control, and reporting of PGT-A results.

125. Ovation owed Plaintiff a duty to exercise the degree of care and skill ordinarily exercised by members of the same or similar profession with similar training and experience situated in the same or similar communities under the same or similar circumstances.

126. Ovation breached the applicable professional standard of care in one or more of the following respects:

a. failing to properly perform the amplification process necessary to complete Plaintiff's PGT-A testing;

b. allowing an error to occur during the amplification process that resulted in the failure of the batch containing Plaintiff's embryo biopsy samples;

c. failing to adequately safeguard against human error during the amplification process, including the type of fluid-transfer error identified by Ovation personnel as a potential cause of the failed amplification;

d. failing to adequately identify, document, investigate, and/or disclose the cause of the amplification failure;

e. otherwise failing to exercise the degree of professional care and skill required under the circumstances, as may be further established through discovery of Ovation's laboratory records, video recordings, validation records, quality-control records, and other information concerning the failed amplification batch; and

f. permitting its laboratory personnel to provide medical advice and treatment recommendations outside the appropriate scope of their role, including advising Plaintiff that an additional rebiopsy would not cause harm to her embryos and recommending that Plaintiff proceed with rebiopsy and testing on another Ovation platform.

127. As a direct and proximate result of Ovation's breaches of the applicable professional standard of care, including the acts and omissions alleged above, Plaintiff suffered the injuries and damages alleged herein.

128. Without conceding that this claim constitutes a "medical malpractice action" within the meaning of N.C.G.S. § 90-21.11(2), or that North Carolina Rule 9(j) applies to this action in federal court, Plaintiff alleges out of an abundance of caution that, prior to filing, the professional conduct

challenged in Paragraph 126(f), together with the records pertaining to that conduct that were available to Plaintiff after reasonable inquiry, was reviewed by a person reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and who is willing to testify that Ovation's conduct in advising Plaintiff that rebiopsy would not cause harm and recommending rebiopsy and testing on another platform did not comply with the applicable standard of care.

## COUNT IV
**Professional Negligence**
**(The IVF Clinic)**

129. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

130. At all relevant times, the IVF Clinic and their agents and/or employees were engaged in providing fertility medical services, including IVF, embryo biopsy, storage, and transfer of embryos.

131. The IVF Clinic and their agents and/or employee undertook to provide medical and professional services to Plaintiff in connection with her fertility treatment and the handling of her embryos.

132. In performing embryo biopsy and rebiopsy, thawing and cryopreservation services, and in counseling Plaintiff concerning whether to subject her embryos to additional thawing and rebiopsy, the IVF Clinic

rendered professional services requiring specialized knowledge, training, skill and judgment.

133. The IVF Clinic owed Plaintiff a duty to exercise the degree of care and skill ordinarily exercised by members of the same or similar health-care profession with similar training and experience situated in the same or similar communities under the same or similar circumstances.

134. The IVF Clinic breached the applicable professional standard of care in one or more of the following respects:

a. failing, before recommending and performing the additional warming and rebiopsy, to adequately counsel Plaintiff concerning the material and incremental risks associated with subjecting previously biopsied and cryopreserved embryos to another warming and biopsy cycle, including the risk of embryo damage or loss and potential adverse effects on IVF outcomes;

b. failing to adequately advise Plaintiff concerning the risks, benefits, and reasonable alternatives associated with the recommended additional warming and rebiopsy;

c. failing to obtain Plaintiff's informed consent to the additional warming and rebiopsy after adequate disclosure of those material risks, benefits, and alternatives; and

d. otherwise failing to exercise the degree of professional care and

skill required under the circumstances.

135. As a direct and proximate result of the IVF Clinic's failure to provide the required counseling and obtain informed consent, Plaintiff proceeded with the additional warming and rebiopsy without adequate knowledge of its material risks. Plaintiff's embryos were thereby subjected to an additional warming and biopsy cycle that they would not otherwise have undergone. One embryo did not survive the warming necessary for the recommended rebiopsy.

136. Without conceding that this action constitutes a "medical malpractice action" within the meaning of N.C.G.S. § 90-21.11(2), or that North Carolina Rule 9(j) applies to this action in federal court, Plaintiff alleges out of an abundance of caution that the care of the IVF Clinic challenged in this Count and all medical records pertaining to the alleged negligence that were available to Plaintiff after reasonable inquiry were reviewed prior to filing by a person reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and who is willing to testify that the IVF Clinic's care did not comply with the applicable standard of care.

**COUNT V**
**Negligent Hiring and Supervision of Employees**
**(Ovation)**

137. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other paragraphs in this Complaint as though

fully set forth in this cause of action.

138. Ovation hired the employees and/or agents that caused, by their actions and/or inactions, the errors during PGT-A testing.

139. Upon information and belief, Ovation conducted inadequate training, supervision and procedures concerning the amplification process and fluid transfer, particularly given Ovation's own post-event retraining and protocol changes.

140. Ovation’s hiring, supervision, and/or training of employees and/or agents responsible for Plaintiff’s embryos was a substantial factor in causing Plaintiff’s harm and damages.

## COUNT VI
## Breach of Contract
## (Ovation)

141. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

142. Plaintiff signed a contract with Ovation to purchase PGT-A testing on August 15, 2023.

143. In the contract, Ovation stated that it created and applies a proprietary calling policy for embryos called the Ovation Fertility Genetics’ Calling Procedure.

144. Ovation also stated that the risk of misdiagnosis with its PGT-A

testing was less than 2%.

145. In the contract, Ovation noted that its testing could have technical problems due to equipment failure or weather disturbances.

146. The contract provided no information on the potential for human error.

147. The contract did not disclose that the LifeView testing platform presented a greater risk of the type of amplification failure than another testing platform available through Ovation.

148. Ovation's conduct was contrary to the provisions of the contract.

149. Ovation materially breached the contract with the Plaintiff when its PGT-A testing failed, was not accurate, and was not performed in compliance with the contract.

150. Breach of the contract resulted in harm and damage to the Plaintiff and her embryos.

**COUNT VII**
**Breach of Fiduciary Duty**
**(Ovation and the IVF Clinic)**

151. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

152. At all times herein mentioned, the IVF Clinic and Ovation were the fiduciaries of Plaintiff.

153. Plaintiff placed trust and confidence in the IVF Clinic to protect, store and maintain Plaintiff's embryos, including but not limited to the biopsy of Plaintiff's embryos, the storage of Plaintiff's embryos, the transfer of Plaintiff's embryos, and decisions about Plaintiff's embryos as they were experts in fertility treatment.

154. Plaintiff also placed trust and confidence in Ovation to properly conduct genetic testing of the embryos because they represented that they were experts in the field of PGT-A testing and utilized breakthrough technology.

155. The IVF Clinic and Ovation exercised specialized knowledge and discretion within their respective roles concerning Plaintiff's embryos, fertility treatment, embryology services, and PGT-A testing.

156. The IVF Clinic and Ovation failed to act as a reasonably careful fiduciary would have acted under the same or similar circumstances.

157. Defendants breached the duties arising from those relationships through the acts and omissions alleged herein.

158. The IVF Clinic and Ovation's breach of fiduciary duty was a substantial factor in causing harm to Plaintiff.

159. This harm includes financial costs, emotional anguish, and the loss of reproductive opportunity because embryos that cannot be transferred or utilized as intended.

**COUNT VIII**

**Fraudulent Misrepresentation and Concealment**
**(Ovation and the IVF Clinic)**

160. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

161. Defendants' acts and practices constitute fraudulent claims because Defendants fraudulently claimed information that was material to the reason Plaintiff entrusted her embryos to Defendants for PGT-A testing, including but not limited to, that Defendants represented to the Plaintiff that:

a. Ovation has a "state-of-the-art genetics laboratory", which was viewed by the Plaintiff on or about August 2023 on Ovation's website prior to the initial purchase of PGT-A testing from Ovation;

b. Ovation has the "best available genetic tests to support selection of embryos with the best chance of creating a healthy pregnancy", which was viewed by the Plaintiff on or about August 2023 on Ovation's website prior to the initial purchase of PGT-A testing from Ovation;

c. Ovation's PGT-A testing reduces the chance of miscarriage, which was in the Informed Consent Preimplantation Genetic Testing (PGT-A) for Aneuploidy that Plaintiff viewed and

signed on August 15, 2023;

d. Ovation's PGT-A testing improves the chance for pregnancy and live birth, which was in the Informed Consent Preimplantation Genetic Testing (PGT-A) for Aneuploidy that Plaintiff viewed and signed on August 15, 2023;

e. Ovation's PGT-A testing has a low misdiagnosis rate of less than 2%, which was in the Informed Consent Preimplantation Genetic Testing (PGT-A) for Aneuploidy that Plaintiff viewed and signed on August 15, 2023;

f. Ovation's PGT-A testing "reduces the time to pregnancy" which was viewed by the Plaintiff on or about August 2023 on Ovation's website prior to the initial purchase of PGT-A testing from Ovation;

g. Ovation's PGT-A testing increases the success of IVF which was viewed by the Plaintiff on or about August 2023 on Ovation's website prior to the initial purchase of PGT-A testing from Ovation;

h. Ovation's PGT-A testing leads to no more mosaic embryos which was viewed by the Plaintiff on or about August 2023 on Ovation's website prior to the initial purchase of PGT-A testing from Ovation;

i. Ovation uses the "most advanced technology available", which was viewed by the Plaintiff on or about August 2023 on Ovation's website prior to the initial purchase of PGT-A testing from Ovation;

j. Ovation's PGT-A testing has a "diagnostic accuracy of 99%", which was viewed by the Plaintiff on the Ovation testing reports on September 18, 2023 and October 25, 2023 thereby providing subsequent misleading representations by Ovation upon which Plaintiff continued to rely;

k. Ovation uses "the most advanced PGT options available", which was viewed by the Plaintiff on or about August 2023 on Ovation's website prior to the initial purchase of PGT-A testing from Ovation;

l. Ovation created and applies a proprietary calling policy for embryos called the Ovation Fertility Genetics' Calling Procedure, which was in the Informed Consent Preimplantation Genetic Testing (PGT-A) for Aneuploidy that Plaintiff viewed and signed on August 15, 2023;

m. Ovation noted that its testing could have technical problems due to equipment failure or weather disturbances but provided no information on the potential of human error in the Informed

Consent Preimplantation Genetic Testing (PGT-A) for Aneuploidy that Plaintiff viewed and signed on August 15, 2023;

n. The IVF Clinic represented that its state-of-the-art laboratory was "one of the few in the region capable of performing preimplantation genetic testing", which was viewed by the Plaintiff on the IVF Clinic's website on or about August 2023 prior to purchasing PGT-A testing as an add-on to her IVF treatment; and

o. The IVF Clinic represented that PGT-A testing improves ongoing pregnancy rates and decreases miscarriage rates, which was viewed by the Plaintiff on the IVF Clinic's website on or about August 2023 prior to purchasing PGT-A testing as an add-on to her IVF treatment.

162. Ovation made these claims on their website, marketing and contracts with the Plaintiff. The IVF Clinic made these claims on their website. Defendants knew that these claims were false and made them with the intent that Plaintiff would rely on them to form their decision to purchase PGT-A testing.

163. Plaintiff reasonably relied on Defendants' claims.

164. Plaintiff was significantly harmed, as described herein, and

Plaintiff's reliance on Defendants' fraudulent claims were a substantial factor in causing such harm.

165. This harm includes financial injury, emotional distress, and the loss of use of embryos that cannot be transferred due to Defendants' misrepresentations and omissions.

## COUNT IX
## Negligent Infliction of Emotional Distress
## (Ovation and the IVF Clinic)

166. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

167. Ovation negligently misrepresented the quality, reliability and accuracy of its PGT-A testing services.

168. Ovation convinced Plaintiff to purchase PGT-A testing based upon false and misleading statements.

169. Ovation and the IVF Clinic also convinced Plaintiff to make serious decisions based upon PGT-A.

170. In fact, by the IVF Clinic refusing to transfer embryos with an "abnormal" or "aneuploid" result or untested embryos, the IVF Clinic severely impacted Plaintiff's decisions based upon PGT-A.

171. Due to errors by Ovation, PGT-A testing did not perform as sold to

the Plaintiff.

172. As a result of Ovation's testing errors and the additional treatment and procedures undertaken following those errors as recommended by Ovation and the IVF Clinic and due to the IVF Clinic's policies, Plaintiff lost months of fertility treatment, incurred additional treatment expenses, and was unable to transfer embryos that may have been suitable for transfer.

173. Defendants' negligent actions resulted in serious emotional distress to Plaintiff which was suffered because of the Defendants' errors in testing and deceptive and misleading representations and omissions about PGT-A testing thereby causing loss of time for fertility treatments, additional retrievals, and the loss of potentially "normal" embryos.

174. For these reasons, Plaintiff has suffered significant emotional damage.

175. It was reasonably foreseeable that errors involving Plaintiff's irreplaceable embryos, recommendations resulting in additional fertility procedures, delays in fertility treatment, and decisions affecting Plaintiff's ability to use her remaining embryos would cause Plaintiff severe emotional distress.

**COUNT X**
**Violation of North Carolina's Unfair Deceptive Trade Practices Act,**
**N.C. Gen. Stat. Ann. § 75-1, *et seq***
**(Ovation)**

176. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

177. Ovation is engaged in "trade" and "commerce" within the meaning of N.C. Gen. Stat. Ann. §75-1.1 as they market, promote and sell PGT-A testing for sale to consumers within the State. Specifically, Ovation markets, promotes, advertises, and sells PGT-A testing services to consumers and potential consumers within the State of North Carolina and elsewhere. Ovation engages in these marketing and sales activities through their website, marketing material, contract, and direct representations to consumers. These activities are conducted in the regular course of Ovation's business and directly affect commerce.

178. Plaintiff's claim under § 75-1, *et seq* arises from Ovation's commercial conduct in marketing, advertising, promoting, and selling PGT-A testing to consumers through representations and omissions concerning the testing's accuracy, reliability, and clinical benefits, rather than from the performance or interpretation of Plaintiff's individual PGT-A testing.

179. Ovation's representations were material to a reasonable consumer and likely to affect consumer decisions and conduct.

180. Ovation used and employed deceptive and unfair methods of competition and unfair or deceptive acts, practices and or representations in

the conduct of trade or commerce.

181. Ovation's acts and practices offend public policy as established by statute. Ovation's acts and practices violate the Federal Trade Commission Act, which provides that "unfair or deceptive acts or practices in or affecting commerce . . . are . . . declared unlawful." 15 U.S.C. Sec. 45(a)(1). An act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n).

182. Ovation's acts and practices are fraudulent, willful, knowing, or intentional, immoral, unethical, oppressive, and unscrupulous.

183. Ovation's conduct is substantially injurious to consumers. Such conduct has, and continues to cause, substantial economic injury to consumers because consumers would not have paid for PGT-A testing but for Ovation's false promotion as detailed throughout this Complaint.

184. Consumers have thus paid unnecessarily for testing and such injury is not outweighed by any countervailing benefits to consumers or competition.

185. No benefit to consumers or competition results from Ovation's conduct. Since consumers reasonably rely on Ovation's representations of its services and injury results, consumers could not have reasonably avoided such

injury.

186. The foregoing unfair and deceptive practices directly, foreseeably and proximately caused Plaintiff and North Carolina consumers to suffer an ascertainable loss when they paid for PGT-A testing based on false and misleading material statements and omissions.

187. Plaintiff is entitled to recover treble damages and other appropriate relief, as alleged below pursuant to N.C. Gen. Stat. Ann. §75-16.

**COUNT XI**
**Unjust Enrichment**
**(Ovation and the IVF Clinic)**

188. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

189. Plaintiff declares this remedy in the alternative to her other claims to the extent there is no adequate remedy at law.

190. Plaintiff purchased PGT-A testing from Ovation based upon misleading and fraudulent statements and omissions.

191. Plaintiff paid the IVF Clinic for embryo biopsies, freezing and thawing of embryos, additional fertility treatment, and associated services, including costs incurred as a result of the failed PGT-A testing and recommended additional warming and rebiopsy.

192. Due to errors by Ovation, the PGT-A testing failed and Plaintiff

was harmed.

193. Due to representations by Ovation and the IVF Clinic about PGT-A testing and the handling of Plaintiff's embryos, Plaintiff was harmed.

194. It is inequitable and unjust for Defendants to retain the amounts received from the Plaintiff for PGT-A testing and associated costs due to Defendants' failure to provide accurate and complete PGT-A testing, failure to provide timely results, and refusal to transfer embryos with inaccurate results.

195. Accordingly, Defendants will be enriched without cause if allowed to retain such funds and must pay restitution to the Plaintiff in the amount which Defendants were unjustly enriched by Plaintiff's purchase of PGT-A testing.

## DEMAND FOR JURY TRIAL

196. Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment in her favor and against Defendants, and each of them, as follows:

a. Awarding Plaintiff all compensatory, statutory, restitution, and punitive damages as permitted by law;

b. Scheduling a trial by jury in this action;

c. Awarding Plaintiff's reasonable attorneys' fees, costs and expenses, as permitted by law;

d. Awarding pre and post-judgment interest on any amounts

awarded, as permitted by law; and

e. Awarding such other and further relief as may be just and proper.

Respectfully submitted this 10th day of September 2026.

Zachary M. Harris
NC State Bar No. 56323
zachary@harrislawnc.com
Harris Legal, PLLC
102 West Third Street, Suite 610
Winston-Salem, NC 27101
Tel./Fax (336) 860-1626

Paula S. Bliss, Esq.*
MA State Bar No. 652361
paula@justicelc.com
Justice Law Collaborative, LLC
210 Washington Street
North Easton, MA 02356
Tel: (508) 230-2700

Allison S. Freeman, Esq.*
FL State Bar No. 69539
allison@constable-law.com
Constable Law, P.A.
139 6th Avenue S
Safety Harbor, FL 34695
Tel: (727) 797-0100

**Appearing by Special Appearance pursuant to Local Rule 83.1(d)*